## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AUBURN REGIONAL MEDICAL
CENTER, et al.,**

**Plaintiffs,**

**v.**                                                Civil Action No.  07-2075 (JDB)

**KATHLEEN SEBELIUS, Secretary,
United States Department of Health and
Human Services,**

**Defendant.**

## MEMORANDUM OPINION

The Secretary of the Department of Health and Human Services, through the Centers for

Medicare and Medicaid Services ("CMS"), is responsible for providing payments known as

"disproportionate share hospital" ("DSH") adjustments to hospitals that serve a significantly

disproportionate share of low income patients, as set forth under the Medicare statute, Title

XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq.  Hundreds of Medicare providers

have, collectively, filed twelve lawsuits in this district to obtain recalculation of their DSH

payments as a result of findings made by the Provider Reimbursement Review Board on March

17, 2006, concerning systemic flaws in the data used by CMS and in the process used to assess

the data.  See Baystate Med. Ctr. v. Mutual of Omaha Ins. Co., Case Nos. 96-1822; 97-1579;

98-1827; 99-2061, Decision No. 2006-D20 (Mar. 17, 2006)  (Pl.'s Mem., Ex. A) ("Baystate

Board Decision").  Those findings were reviewed by this Court, and sustained in part, as set forth

in an opinion issued on March 31, 2008.  Baystate Med. Ctr. v. Leavitt, 545 F. Supp. 2d 20,

amended in part, 587 F. Supp. 2d 37 (D.D.C. 2008).

In this first of the post-Baystate lawsuits, seventeen Medicare providers seek judicial relief from allegedly erroneous DSH payment determinations for fiscal years 1987-1994. Plaintiffs filed administrative appeals of those DSH determinations with the Board on September 12, 2006.  See Compl. ¶ 52.  They requested "equitable tolling" of the 180-day limitations period for filing such appeals, recognizing that, absent such tolling, their appeals would be barred by the 180-day deadline set forth in 42 U.S.C. § 1395oo(a).  The Board dismissed their appeals as untimely, holding, inter alia, that it lacked authority to grant a request for equitable tolling.  See In re Crowell & Moring 87-93 DSH Equitable Tolling Group, Case No. 06-2357G (Sept. 18, 2007) (Compl., Ex. B) ("In re Equitable Tolling Group, Board Decision").  Plaintiffs contend that the Board's decision was contrary to law and ask this Court to hold their administrative appeals timely.  Compl. ¶¶ 59-60.  In the alternative, they seek an order from this Court directing the Secretary to order the Medicare fiscal intermediaries "to make new DSH determinations for the FYs at issue . . . using correct . . . percentages" through a grant of mandamus or similar order under the Mandamus Act, 28 U.S.C. § 1361, the All Writs Act, 28 U.S.C. § 1651, or the federal question statute, 28 U.S.C. § 1331.  Id. ¶¶ 61-64.

In response, defendants have moved to dismiss the complaint on the ground that plaintiffs' administrative appeals were untimely and hence, judicial review is not available under § 1395oo(f).  Defendants further contend that plaintiffs are not entitled to mandamus relief under § 1361 or any other statute because they have failed to identify a nondiscretionary duty owed to plaintiffs or otherwise satisfied the extraordinary requirements for mandamus relief.  A hearing on defendant's motion was held on January 21, 2010.  For the reasons explained below, the

Court will grant defendant's motion to dismiss.[1]

## BACKGROUND

### I.      Statutory and Regulatory Background

Through a complex statutory and regulatory regime, the Medicare program reimburses qualifying hospitals for the services they provide to eligible elderly and disabled patients. See generally County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999). The "operating costs of inpatient hospital services" are reimbursed under a prospective payment system ("PPS") -- that is, based on prospectively determined standardized rates -- but subject to hospital-specific adjustments. 42 U.S.C. § 1395ww(d); see generally In re Medicare Reimbursement Litig., 309 F. Supp. 2d 89, 92 (D.D.C. 2004), aff'd, 414 F.3d 7, 8-9 (D.C. Cir. 2005). One such adjustment is the "disproportionate share hospital" ("DSH") adjustment which requires the Secretary to provide an additional payment to each hospital that "serves a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Whether a hospital qualifies for the DSH adjustment, and the amount of the adjustment it receives, depends on the "disproportionate patient percentage" determined by the Secretary under a statutory formula. 42 U.S.C. § 1395ww(d)(5)(F)(v)-(vii). This percentage is a "proxy measure for low income." See H. R. Rep. No. 99-241, at 16-17 (1985), reprinted in 1986 U.S.C.C.A.N. 579, 594-95.

The disproportionate patient percentage is the sum of two fractions, commonly referred to as the Medicaid fraction (often called the Medicaid Low Income Proxy) and the Medicare

---

[1] For ease of reference, the memorandum in support of defendant's motion to dismiss and reply brief will be cited as "Def.s' Mem.," and "Def.s' Reply," respectively. Plaintiffs' opposition brief will be cited as "Pls.' Mem."

fraction (the Medicare Low Income Proxy).  42 U.S.C. § 1395ww(d)(5)(F)(vi); <u>Jewish Hospital,</u>

<u>Inc. v. Secretary of Health and Human Servs.</u>, 19 F.3d 270, 272 (6th Cir. 1994).  The Medicare

fraction -- the focus of this litigation -- reflects the number of hospital inpatient days attributable

to Medicare Part A patients who are also entitled to Supplemental Security Income ("SSI")

benefits at the time of their hospital stays, and, hence, is often referred to as the SSI fraction or

SSI percentage.  <u>See</u> <u>Baystate</u>, 545 F. Supp. 2d at 22-23.  A detailed description of the data

underlying the SSI fraction and the methodology used by CMS is set forth in this Court's

<u>Baystate</u> decision.[2]  <u>See</u> 545 F. Supp. 2d at 23-24.  It is sufficient to state here that calculation of

the numerator of the SSI fraction requires use of voluminous SSI data from the Social Security

Administration, and that CMS has taken on sole responsibility for computation of the SSI

fraction.  <u>Id.</u> (citing 51 Fed. Reg. 31454, 31459 (Sept. 3, 1986) (DSH final rule)).

Medicare payments are initially determined by a "fiscal intermediary" -- typically an

insurance company that acts as the Secretary's agent for purposes of reimbursing health care

providers.  <u>See</u> 42 C.F.R. §§ 421.1, 421.3, 421.100-.128.[3]  A fiscal intermediary is required by

regulation to apply the SSI fraction computed by CMS.  <u>See</u> <u>id.</u> § 412.106(b)(2) and (b)(5).  The

intermediary sets forth the total payment -- including any DSH payment -- due to a provider for a

particular fiscal year in a Notice of Program Reimbursement ("NPR").  <u>Id.</u> § 405.1803.

---

[2] CMS was known as the Health Care Financing Administration during the fiscal years at issue.  Hence, the references to CMS throughout this opinion encompass HCFA as well.

[3] The citations to the Code of Federal Regulations are to the 2007 version in effect at the time the Board issued the decision under review.  Defendant notes that the Secretary has amended the regulations since then, but the applicability of the amendments is limited to "'appeals pending as of, or filed on or after, August 21, 2008,'" with exceptions not applicable here.  <u>See</u> Def.'s Mem. at 6 n.3 (quoting 73 Fed. Reg. 30,190 (May 23, 2008)).  Plaintiffs agree that the 2007 version applies.  Pls.' Mem. at 21.

A provider dissatisfied with the amount of the award may request a hearing before the

Provider Reimbursement Review Board ("PRRB" or "Board"), an administrative body composed

of five members appointed by the Secretary.  42 U.S.C. § 1395oo(a), (h). Section 1395oo(a)(3)

provides that such appeals must be filed "within 180 days after notice of the intermediary's final

determination."  The PRRB has the authority to affirm, modify, or reverse the final determination

of the intermediary, and the Secretary may then reverse, affirm, or modify the Board's decision

within 60 days thereafter.  Id. § 1395oo(d) and (f).  Providers may obtain judicial review of "any

final decision of the Board" or the Secretary's reversal, affirmance, or modification thereof, by

commencing a civil action within 60 days of receipt of any final decision.  Id. § 1395oo(f).

The Secretary has, by regulation, authorized the Board to grant an extension of the 180-

day administrative appeal period "for good cause shown," if a request for extension is filed not

"more than 3 years after the date the notice of the intermediary's determination is mailed to the

provider."  42 C.F.R. § 405.1841(b).  The regulation prohibits the Board from extending the 180-

day deadline for administrative appeals if the request is submitted after that three-year period.  Id.

Apart from the administrative appeal process, a provider also may obtain administrative

relief from an intermediary's determination by requesting a "reopening."  In most instances, a

request for reopening must be submitted within three years of the date of the intermediary

determination or Board decision at issue, but in cases of "fraud or similar fault of any party to the

determination," the three-year deadline does not apply.  See 42 C.F.R. § 405.1885(a), (d);

see generally Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 809 (D.C. Cir. 2001).  The

regulations provide that reopening is discretionary in some circumstances and mandatory in

others.  42 C.F.R. § 405.1885(a)-(b), (d).  Hospitals may not seek judicial review of an

intermediary's denial of a motion to reopen because a refusal to reopen is not a "final

determination . . . as to the amount" reviewable by the Board under § 1395oo(a)(1), but rather is a refusal to make a new determination.  <u>Your Home Visiting Nurse Servs., Inc. v. Shalala</u>, 525 U.S. 449, 453 (1999); <u>accord</u>, <u>Monmouth</u>, 257 F.3d at 811.

## II.   Factual Background

Plaintiffs are various hospitals who participated in the Medicare program at various times between fiscal years 1987 through 1994.  Compl. ¶¶ 4-11.  Each hospital received a Notice of Program Reimbursement setting forth its DSH payment determination, which typically occurs within two to three years of the end of a fiscal year.  <u>Id.</u> ¶¶ 50-51, 53; <u>see</u> <u>Baystate Med. Ctr.</u>, 545 F. Supp. 2d at 42.[4]  None of the plaintiffs filed an administrative appeal within 180 days of receipt of the NPRs.  Compl. ¶ 53.

On March 17, 2006, over ten years after the fiscal years at issue, the PRRB addressed whether there were systemic flaws in the data underlying the DSH payment determinations in the context of resolving the claims of Baystate Medical Center -- a nonparty to this case -- which had lodged a timely appeal of its DSH payments for fiscal years 1993 through 1996.  545 F. Supp. 2d at 26-30.  Baystate had alleged that certain categories of SSI eligibility records were omitted from the data tapes used by CMS to calculate the SSI fraction of the DSH percentage and that the patient identifiers used by CMS resulted in undercalculation of the SSI fraction.  <u>Id.</u>  The Board found, <u>inter</u> <u>alia</u>, that several categories of SSI eligibility data had been omitted from the CMS calculations, that the "match process" used by CMS to determine the number of SSI eligible

---

[4]  The complaint is silent on the exact date the NPRs were issued. Defendant represents that the NPRs were issued during the 1989-1996 time frame, consistent with the two-to-three year cost settlement process described in <u>Baystate</u>, and plaintiffs have not disputed this.  <u>See</u> Def.'s Mem. at 7.  The exact dates are not, in any event, material to the resolution of defendant's motion.

Medicare beneficiaries was flawed, and that these omissions and flaws tended to deflate the overall DSH payment. Id. The Board thus remanded the case to the intermediary for recalculation of Baystate's DSH payment. Id. at 30. The Board's findings subsequently underwent additional administrative and judicial review, resulting in this Court's decision in the Baystate litigation, which left the Board's findings concerning the omissions in data and flaws in the match process largely intact. See 545 F. Supp. 2d at 40-55.[5]

On September 12, 2006, about three months after the Board's Baystate decision, plaintiffs appealed their DSH payment determinations to the Board on the ground that the determinations were made using an understated SSI fraction. Compl. ¶ 52. They acknowledged that each of their appeals was filed more than three years after the NPRs had been issued. Id. ¶ 53. However, plaintiffs asked the Board to find the appeals timely under the principle of equitable tolling. Id. ¶ 54. They contended that equitable tolling applied because the hospitals' failure to file an appeal within 180 days of issuance of the NPRs was the result of CMS's refusal to inform the hospitals that their SSI percentages were incorrectly understated for the fiscal years at issue, citing the Board's Baystate decision. Id. ¶ 55. In their view, then, the appeals were timely because they were filed within 180 days of the Board's Baystate decision. Id. ¶¶ 54-56.

On September 18, 2007, the Board held that it lacked jurisdiction over the hospitals' appeals because they were not timely filed. See In re Equitable Tolling Group, Board Decision at

_____

[5] The CMS Administrator, acting for the Secretary, reversed the Board's decision granting relief to Baystate, reasoning that CMS had relied on the "best available data" and that the omissions were not significant. Baystate, 545 F. Supp. 2d at 31-34. Baystate then sought judicial review in this Court. On cross-motions for summary judgment, the Court held, in relevant part, that the Administrator acted arbitrarily and capriciously in finding that CMS had relied on the "best available data" to calculate the SSI fraction because several categories of SSI eligibility data available to CMS had been excluded from the calculations. Id. at 40-50.

3.  The Board reasoned that it had only the powers granted to it by statute and regulation, which limited its authority to hear an administrative appeal to requests filed within 180 days of the date of the final determination (42 U.S.C. § 1395oo(a)) or requests demonstrating "good cause" for a late appeal within three years after the intermediary's determination was mailed to the provider (42 C.F.R. § 405.1841(b)).  Id.  The Board determined that "[g]ood cause for late filing cannot be considered in these cases because the cases [were] filed more than three years after the issuance of the NPRs . . . . " Id. at 2.  The Board further concluded that it did not have "general equitable powers," but instead was limited to the equitable powers granted by § 405.1841(b), as well as the reopening regulation, § 405.1885.  Id.  Therefore, the Board held the appeals untimely.  Id. at 3. The Secretary declined to review the Board's decision.  See Compl., Ex. B.  Plaintiffs then brought this action seeking judicial review pursuant to § 1395oo(f) or, in the alternative, a judicial order directing the Secretary to order the Medicare fiscal intermediaries "to make new DSH determinations for the FYs at issue . . . using correct SSI percentages" through a grant of mandamus.  Plaintiffs also contend that their challenges may be reviewed directly under the federal question statute if judicial review is not available elsewhere.

## STANDARD OF REVIEW

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations must be presumed true, and plaintiff must be given every favorable inference that may be drawn from the allegations of fact.  Scheuer, 416 U.S. at  236; Sparrow v. United Air Lines, Inc., 216 F.3d

1111, 1113 (D.C. Cir. 2000).  However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint.  Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court -- plaintiffs here -- bears the burden of establishing that the court has jurisdiction.  See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, as long as it still accepts the factual allegations in the complaint as true.  See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is mindful that all that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); Atherton v. District of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.

In resolving a motion to dismiss an action for relief in the nature of mandamus, courts have characterized the issue as involving both a jurisdictional and a merits inquiry because, in determining whether the court has jurisdiction to compel an agency or official to act, the court must consider the merits question of whether a legal duty is owed to the plaintiff under the relevant statute.  See In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) (noting that to the extent a court considers whether a statute creates a duty, "mandamus jurisdiction under [28 U.S.C.] § 1361 merges with the merits").  Whether a motion to dismiss a mandamus action should be considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) is a matter on which there are "conflicting signals,"[6] but In re Cheney indicates that the better course is to consider the matter a merits issue, both in the court's characterization of the jurisdictional and merits inquiries as

---

[6] See Ahmed v. Dep't of Homeland Security, 328 F.3d 383, 386-87 (7th Cir. 2003); Swan v. Clinton, 100 F.3d 973, 976-77 n.1 (D.C. Cir. 1996).

"merged" and in the purposeful manner in which it limited its review of the record to the sufficiency of the complaint and the documents attached thereto. Id. at 729-30. Therefore, with respect to the mandamus claim, defendant's motion to dismiss will be considered pursuant to Rule 12(b)(6).

## DISCUSSION

### I.    Availability of Judicial Review Under 42 U.S.C. § 1395oo(f)

Defendant raises the threshold issue of whether the Court has jurisdiction under the Medicare Act, 42 U.S.C. § 1395oo(f), to review the Board's decision.  Defendant contends that § 1395oo(f) limits judicial review to a "final decision of the Board," and that under Athens Comm. Hosp. v. Schweiker, 686 F.2d 989 (D.C. Cir. 1982),[7] a Board decision dismissing an appeal based on expiration of the 180-day statutory deadline is not a "final decision" within the meaning of the statute.  See Def.'s Mem. at 9-11; Def.'s Reply at 3-7.  Plaintiffs respond that the 180-day limitations period is not a jurisdictional hurdle subject to Rule 12(b)(1) scrutiny, but is instead properly construed as a statute of limitations that, like other limitations periods, is subject to equitable tolling.  Pls.' Mem. at 13-16.  Plaintiffs further counter that Athens confirms that judicial review of the Board's dismissal decision is available under § 1395oo(f), and posit that defendant has misconstrued Athens.  Id. at 16-19.  Resolution of defendant's motion requires a close examination of the language of both § 1395oo and Athens.

---

[7] Athens Comm. Hosp. was modified on rehearing with respect to an issue unrelated to this "final decision" question.  See 743 F.2d 1 (D.C. Cir. 1984). The modified opinion was later overruled by the Supreme Court in Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399 (1988).  The parties presume that the original Athens opinion remains the governing law of this circuit on what constitutes a "final decision" subject to judicial review, and the Court agrees. A careful review of those subsequent decisions shows that the "final decision" analysis set forth in the original Athens opinion was not subsequently called into question.

The relevant statutory language is as follows:

> (a) Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a [PRRB] . . . and any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww . . . may obtain a hearing with respect to such payment by the Board, if --

> > (3) such provider files a request for hearing <u>within 180 days after notice of the intermediary's final determination</u> . . .

> . . .

> > (f) . . . Providers shall have the right to obtain judicial review of <u>any final decision of the Board</u> . . . by a civil action commenced within 60 days of the date on which notice of <u>any final decision by the Board</u> . . . is received.

> > . . . .

42 U.S.C. § 1395oo (emphasis added). At the outset, it is important to note that the 180-day limitations period cannot plausibly be characterized as jurisdictional. First and foremost, there is no language in § 1395oo(a) or (f) indicating that the limitations period is jurisdictional. The Supreme Court has cautioned that, "when Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character." <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 515-16 (2006); <u>see also</u> <u>Union Pacific R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment</u>, 130 S. Ct. 584, 596 (2009) ("Recognizing that the word 'jurisdiction' has been used by courts, including this Court, to convey 'many, too many, meanings,' we have cautioned, in recent decisions, against profligate use of the term. Not all mandatory 'prescriptions, however emphatic, are . . . properly typed jurisdictional.'") (quoting <u>Arbaugh</u>, 546 U.S. at 510); <u>Oryszak v. Sullivan</u>, 576 F.3d 522, 525 & n.2 (D.C. Cir. 2009) (describing <u>Arbaugh</u> as holding that a "limitation on [a] cause of action that 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts' is not jurisdictional"). Second, the agency has promulgated regulations authorizing extension of the

12

180-day period for good cause, if such a request is filed within three years of issuance of the

NPR.  See 42 C.F.R. § 405.1841(b).  If the statutory 180-day period were jurisdictional, the

Board could not enlarge it by rule.

Ultimately, however, defendant's argument against judicial review under § 1395oo(f)

does not depend on whether the 180-day limitations period is characterized as "jurisdictional" or

as a nonjurisdictional prerequisite to obtaining relief.  Even in the latter case, the Court still must

consider whether a Board decision dismissing an appeal based on expiration of the 180-day

limitations period is a "final decision" subject to judicial review.  Resolution of what constitutes

a "final decision" subject to judicial review requires close examination of Athens.

In Athens, the provider had filed a timely administrative appeal challenging several cost

adjustments in its Notice of Program Reimbursement, and later sought to amend its appeal to

include additional categories of costs that it had not originally sought from the intermediary.  686

F.2d at 992-93.   The Board held that it lacked jurisdiction to consider the new claims.  Id.  The

court considered in that context "whether a decision by the PRRB not to exercise jurisdiction is a

'final decision' sufficient to establish [the court's] jurisdiction" under § 1395oo(f).  Id. at 993.

The court held "if the threshold requirements of 42 U.S.C. § 1395oo(f)(1) are met, a court has

jurisdiction to review a decision by the PRRB that it lacks jurisdiction to review a determination

of the fiscal intermediary."  Id. at 994 (emphasis added).  Hence, the court held that it had

jurisdiction to review the PRRB decision before it, because an appeal had been filed with the

Board within the 180-day limitations period and the other threshold statutory requirements had

been satisfied.

Athens left no doubt that it considered one of the essential "threshold requirements"

giving rise to a "final decision" to be the filing of an administrative appeal within the 180-day

limitations period.  This is made clear from the court's approval of the district court's dismissal of an untimely challenge to a PRRB decision in <u>John Muir Mem. Hosp. v. Califano</u>, 457 F. Supp. 848 (N.D. Cal. 1978).  The court in <u>Athens</u> explained that "in <u>John Muir</u> . . . the question was whether the Board had jurisdiction to hear an appeal from an intermediary's decision" where an appeal had <u>not</u> been filed with the Board within the 180-day limitations period.  686 F.2d at 993. It found <u>John Muir</u> was "easily distinguished" from the outcome in <u>Athens</u> because "42 U.S.C. § 1395oo(f)(1) jurisdiction was not available to the court." <u>Id.</u> at 993-94 (discussing <u>John Muir</u>, 457 F. Supp. at 853).  The court elaborated in a footnote that "[§ 1395oo(f)] jurisdiction was not available to the court in <u>John Muir</u> *because the provider failed to timely file its appeal.*  Under the statute, a decision by the PRRB not to hear a case on this basis is, by definition, not a 'final decision.'" <u>Id.</u> at 994 n.4 (emphasis added).

In light of <u>Athens</u>' express reference to satisfaction of "the threshold requirements of 42 U.S.C. § 1395oo(f)(1)," and its statement in footnote 4 that, with respect to a "provider [who] failed to timely file its appeal . . . a decision by the PRRB not to hear a case on this basis is, by definition, not a 'final decision,'" <u>Athens</u> is properly understood as holding that a plaintiff may obtain judicial review of a PRRB refusal to exercise jurisdiction only if an administrative appeal has been filed within the 180-day limitations period.

Admittedly, this reading does not lead to the most intuitive result. The PRRB decision at issue has the hallmarks of decisions that are commonly considered "final" in other areas of the law.  For example, it marks the consummation of the agency's decisionmaking process and is an action that results in rights having been determined.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 177-78 (1997) (discussing requirements of "final agency action" within the meaning of the Administrative Procedure Act).  Indeed, both the Board and the Secretary presumed that the

Board decision would be subject to judicial review.  See In re Equitable Tolling Group, Board

Decision at 3 ("Review of this determination is available under the provisions of 42 U.S.C. §

1395oo(f)(1)"); Letter from CMS to Robert Roth, dated Nov. 1, 2007 (referring to availability of

judicial review within 60 days of Board decision) (Compl., Ex. B).  Moreover, as Athens

observed, "[judicial] dismissals for lack of jurisdiction consistently have been understood as

'final decisions,'" and by analogy, Board dismissals also may be considered final decisions.  686

F.2d at 993 (discussing Cleveland Mem. Hosp. v. Califano, 444 F. Supp. 125 (E.D.N.C. 1978),

aff'd, 594 F.2d 993 (4th Cir. 1979)).

      Indeed, Athens approved of the determination in Cleveland that a PRRB dismissal order

based on failure to satisfy the § 1395oo(a) amount-in-controversy provision -- another threshold

statutory requirement -- was a "final decision" within the meaning of that statute.  Hence, there is

some tension in the conclusion that the PRRB decision in Cleveland was a "final decision," but

the PRRB decision in John Muir was not.  One can reconcile that tension in perhaps two ways:

first, as defendant suggested at the motions hearing here, the 180-day limitations period stands in

a different stead than the amount-in-controversy requirement because of the government's

recognized interest in imposing finality on the Medicare reimbursement process;[8] and second,

where there is a "real dispute" over whether a threshold requirement of § 1395oo(f) is satisfied,

such as with the amount-in-controversy in Cleveland (in contrast to the parties' agreement in

Muir that 180 calendar days from the final NPR had run), then the Board's resolution of that issue

will constitute a judicially reviewable "final decision."  See St. Joseph's Hosp. of Kansas City v.

Heckler, 786 F.2d 848, 852 (8th Cir. 1986).  Neither explanation is entirely satisfactory, but the

_____

    [8] As defendant noted at the motions hearing, this interest was recognized in Califano v.
Sanders, 430 U.S. 99, 108 (1977), and Your Home Visiting Nurse Servs., 525 U.S. at 453.

Court need not choose between those explanations, nor identify another, in light of the clear decision in Athens.

This Court must follow Athens' instruction that, with respect to a "provider [who] failed to timely file its appeal . . . a decision by the PRRB not to hear a case on this basis is, by definition, not a 'final decision.'" Athens, 686 F.2d at 994 & n.4. Plaintiffs concede that they filed their appeals to the Board "more than three years after the Medicare NPRs had been issued for each of the FYs at issue." Compl. ¶ 53. Hence, under Athens, the Board decision dismissing their appeals as untimely is not a "final decision" within the meaning of § 1395oo(f), and is accordingly not subject to judicial review.[9]

_____

[9] This understanding of Athens is in accord with the decisions of other courts that have considered the consequences of a provider's failure to comply with the 180-day limitations period, notwithstanding a provider's proffer of equitable reasons in support of an extension or reopening. See St. Joseph's Hosp. of Kansas City, 786 F.2d at 852 (observing that, in Athens, "the District of Columbia Circuit, while not specifically faced with the issue of whether the Board's refusal to hear an untimely appeal is a final decision, . . . endorsed the decision in John Muir," and agreeing that "section 1395oo(a) defines the limits of the Board's jurisdiction to render a final decision"); Miami Gen. Hosp. v. Bowen, 652 F. Supp. 812, 814 (S.D. Fla.1986) ("42 U.S.C. § 1395oo provides for judicial review of [fiscal intermediary] determinations only where all of its procedural requisites have been met, among which is the requirement that a provider . . . file a request for hearing before the . . . [PRRB] within 180 days after . . . [the NPR] has been received"); Arcadia Valley Hosp. v. Bowen, 641 F. Supp. 190, 192 (E.D. Mo. 1986) ("Without meeting the 180 day time period of the statute, the Board . . . cannot issue a judicially reviewable final decision"); Univ. of Chicago Hosp. & Clinics v. Heckler, 605 F. Supp. 585, 586 (N.D. Ill. 1985). But cf. Ozark Mountain Regional Rehabilitation Ctr. v. HHS, 798 F. Supp. 16, 20 n.2 (D.D.C. 1992) (construing Athens as authorizing judicial review over appeals brought within the three-year period set forth at 42 C.F.R. § 405.1841(b)).

Plaintiffs contend that these cases are not applicable because they involve requests for a "good cause" extension of the 180-day limitations period in accordance with 42 C.F.R. § 405.1841, whereas plaintiffs never asked the Board for a "good cause" extension of the appeal period, instead requesting equitable tolling. See Pls.' Mem. at 19 n.8. But plaintiffs fail to recognize that, to the extent those cases discuss the law governing what is a "final decision" within the meaning of § 1395oo(f) -- one of the main issues here -- and do so in a manner that sheds light on the correct interpretation of Athens, they are, of course, relevant.

II.      **Equitable Tolling**

Even if the PRRB decision is a "final decision" subject to judicial review under

§ 1395oo(f), plaintiffs may not obtain relief thereunder unless the statute authorizes "equitable

tolling."  Defendant contends that the explicit language of the statute shows that Congress

intended to achieve finality by imposing a firm limitation on the time period within which

payment determinations may be challenged.  See Def.'s Mem. at 19-20.  Defendant urges that

equitable tolling therefore must be rejected here, just as it was rejected by the Supreme Court in

the tax collection context in United States v. Brockamp, 519 U.S. 347 (1997).  Defendant

acknowledges that the Secretary has created an exception to the statutory time limit -- the three-

year "good cause" extension authorized by 42 C.F.R. § 405.1841(b) -- but contends that this

exception is within the broad grant of rulemaking authority at 42 U.S.C. §§ 1302 and 1395hh and

does not undercut defendant's position that no equitable tolling is otherwise allowed since it still

imposes an outer limit of three years for administrative appeals, consistent with Congress's intent

to achieve finality for payment calculations.  Id. at 20.  In defendant's view, plaintiffs' equitable

tolling theory would effectively "extinguish" the time limitations on the handling of

administrative claims.  Id.

In response, plaintiffs contend that, under Supreme Court precedent, there is a

presumption in favor of equitable tolling, relying primarily on Irwin v. Dep't of Veterans Affairs,

498 U.S. 89, 95-96 (1990), Bowen v. City of New York, 476 U.S. 468 (1986), and Bradford

Hosp. v. Shalala, 108 F. Supp. 2d 473 (W.D. Pa. 2000).  Plaintiffs view Brockamp as an outlier

that was based on specific statutory language and the uniqueness of the IRS taxpayer refund

context at issue.

The starting point in determining whether equitable tolling is available under § 1395oo(f)

17

is Congressional intent, rather than the applicability of one presumption or another.  This is clear from the cases cited by both plaintiffs and defendant.  See Brockamp, 519 U.S. at 350 (resolving the equitable tolling issued based on the standard:  "Is there good reason to believe that Congress did not want the equitable tolling doctrine to apply?"); City of New York, 476 U.S. at 480 (examining whether application of equitable tolling to 60-day judicial review period is "consistent with the overall Congressional purpose" and is "nowhere eschewed by Congress"); Irwin, 498 U.S. at 95 (emphasizing importance of "greater fidelity to the intent of Congress" and application of a principle that is "a realistic assessment of legislative intent").

Irwin, however, offers scant instruction on whether Congress intended equitable tolling to apply under a regime such as the Medicare program.  Irwin was a Title VII case that involved of whether the limitations period for filing a Title VII suit against the federal government was subject to equitable tolling, as it was for "private" employers.  See 498 U.S. at 95 ("[W]e have held that the statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling.").  The Supreme Court reasoned that "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver."  Id. (emphasis added).  The Court then stated that "[w]e therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."  Id. at 95-96.  This suggests that, without the existence of equitable tolling in a parallel suit against a private defendant -- and none has been identified here -- there would be no presumption of equitable tolling.[10]

---

[10]  For this reason, plaintiffs' reliance on Bradford Hospital v. Shalala, 108 F. Supp. 2d
(continued...)

Nor does <u>City of New York</u> advance the analysis in any significant measure. There, the Supreme Court considered whether equitable tolling applied to the 60-day judicial review period for agency determinations as to Social Security "disability" status, and held that equitable tolling was available. But the language of the relevant statute, 42 U.S.C. § 405(g), was materially different. <u>See</u> 476 U.S. at 471-75. Section 405(g) provided for judicial review of an agency decision "within sixty days after the mailing to him of notice of such decision <u>or within such further time as the Secretary may allow.</u>" 476 U.S. at 472 n.3 (emphasis added). That open-ended discretionary language -- "within such further time as the Secretary may allow" -- is altogether absent from the 180-day limitations period set forth in § 1395oo(a)(3).

<u>Brockamp</u> offers the most insightful guidance on discerning Congressional intent with respect to equitable tolling, indicating that in a complex regulatory regime, courts should focus on the language of the statute and the "nature of the underlying subject matter." 519 U.S. at 350-53. In <u>Brockamp</u>, the Supreme Court considered whether the limitations period for filing tax refund claims, 26 U.S.C. § 6511, was subject to equitable tolling, and held that "Congress did not intend the 'equitable tolling' doctrine to apply." <u>Id.</u> at 348, 354. The Court found significant that the statute expressed its time limitations in "unusually emphatic form," and "in a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit

---

[10](...continued)
473 (W.D. Pa. 2000), does little to advance their argument. In finding equitable tolling available, the district court deemed the Medicare regulation at issue (42 C.F.R. § 412.328(f)) "more analogous to the Title VII limitation provision in 42 U.S.C. § 2000e-16," and hence applied <u>Irwin</u>'s presumption of equitable tolling, finding <u>Brockamp</u> inapposite. 108 F. Supp. 2d at 485. But that characterization is incorrect, for as discussed above, <u>Irwin</u> has little applicability to limitations periods in the Medicare context. In any event, the district court's assessment of 42 C.F.R. § 412.328(f) sheds no light on this Court's assessment of a separate statutory provision.

exceptions."[11]  Id. at 350-51.   The Court also emphasized that the statute set forth "explicit

exceptions to its basic time limits, and those very specific exceptions do not include 'equitable

tolling.'"  Id. at 351.  The Court considered secondarily whether the "nature of the underlying

subject matter" -- tax collection -- supported its conclusion that Congress did not intend for

equitable tolling to apply.  Id. at 352-53 ("The nature of the underlying subject matter . . .

underscores the linguistic point.").   Considering the sheer number of tax returns and tax refunds

processed each year -- 200 million tax returns, and 90 million refunds -- the Court found it

reasonable to infer that Congress did not intend equitable tolling to apply.   Id. ("The nature and

potential magnitude of the administrative problem suggest that Congress decided to pay the price

of occasional unfairness in individual cases . . . in order to maintain a more workable tax

enforcement system.")

Applying these considerations here, the Court's assessment is that § 1395oo sets forth in

"emphatic" language that the 180-day limitations period shall apply, albeit to a slightly lesser

degree than does 26 U.S.C. § 6511.  Section 1395oo(a)(3) states that a provider may obtain a

Board hearing in enumerated scenarios "if" --

> (3) such provider files a request for a hearing within 180 days after
> notice of the intermediary's final determination under paragraph
> 1(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180
> days after notice of the Secretary's final determination, or with
> respect to appeals pursuant to paragraph (1)(B) or (C), within 180
> days after notice of such determination would have been received
> if such determination had been made on a timely basis.

Section 1395oo also contains a provision concerning accumulation of interest that is tied to the

---

[11]  Section 6511 states that a "[c]laim for . . . refund . . . of any tax . . . shall be filed by the
taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was
paid, whichever of such periods expires the later, or if no return was filed . . . within 2 years from
the time the tax was paid."  26 U.S.C. § 6511(a)

180-day limitations period:

> (f)(2) Where a provider seeks judicial review pursuant to paragraph
> (1), the amount in controversy shall be subject to annual interest
> beginning on the first day of the first month beginning after the
> 180-day period as determined pursuant to subsection (a)(3) of this
> section . . . .

42 U.S.C. § 1395oo(f)(2).  As in the tax refund setting, moreover, the limitations provisions

appear "in a highly detailed technical manner."

To be sure, the statutory language addressing the limitations period here is not as complex

as that reviewed in Brockamp.  Nonetheless, the language on its face bears no indicia that

equitable tolling is intended, and the D.C. Circuit, in HCA Health Servs. of Oklahoma, Inc. v.

Shalala, 27 F.3d 614, 620 (D.C. Cir. 1994), described the statutory language as demonstrating

that, "[i]f a provider permits that deadline to lapse, the Statute envisions no further appeal of the

intermediary's decision."  That court further observed that allowing a provider to bypass the 180-

day limitations period (in that case, by obtaining reopening more broadly than authorized by the

reopening regulations) "'would frustrate the congressional purpose, plainly evidenced in [the

statute], to impose a [time] limitation upon . . . review.'"  Id. at 620 (quoting Califano v. Sanders,

430 U.S. 99, 108 (1977))  (alterations in original, emphasis added).  Hence, under HCA, and this

Court's own reading of § 1395oo(a)(3), the plain language of the statute indicates that Congress

did not intend to authorize equitable tolling.

And there is more.  As noted earlier, the Secretary has longstanding and comprehensive

regulations governing extension of the administrative appeal period and also reopening of

payment determinations by an intermediary or, in an appropriate case, the Board or Secretary.  42

C.F.R. §§ 405.1841(b), 405.1885.  Brockamp did not have occasion to consider whether an

agency's promulgation of rules that effectively extend or toll the time for seeking administrative

relief would have affected its analysis.  But because those regulations were promulgated pursuant to the Secretary's statutory authority, and have been validated by the D.C. Circuit and the Supreme Court, they must weigh in this calculus.

The regulations governing extension of the administrative appeal period and reopening of old decisions are very detailed -- comparable to the detailed timing provisions at issue in Brockamp.  They generally establish three years as the outer limit for reopening where one of the showings enumerated in the regulation has been made, and like the provision reviewed in Brockamp, the time limitations are set forth in "unusually emphatic form," and "in a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit exceptions."  See 519 U.S. at 35-51.  In particular, they provide, inter alia, that: "Any such request to reopen must be made within 3 years of the date of the notice of the intermediary or Board hearing decision . . . .  No such determination or decision may be reopened after such 3-year period except as provided in paragraphs (d) and (e) of this section."  42 C.F.R. § 405.1885(a).   The regulations also delineate the standard for determining when reopening will be mandatory, providing that a determination "must be reopened and revised by the intermediary if, within the three year period specified in paragraph (a) of this section, CMS . . . provides notice to the intermediary that the intermediary determination . . . is inconsistent with the applicable law, regulations, CMS ruling, or CMS general instructions in effect . . . ."  Id. § 405.1885(b).  One circumstance where the three-year period shall not apply is identified -- where "it is established that such determination or decision was procured by fraud or similar fault of any party to the determination or decision."  Id.  § 405.1885(d) (emphasis added).

HCA Health Servs. held that the Secretary's reopening regulations fell "comfortably" within her rulemaking authority under 42 U.S.C. §§ 1302 and 1395hh.  27 F.3d at 618.  More

significantly, in rejecting a provider's argument that the reopening provisions should be read broadly, the court observed that "[p]erhaps the most convincing argument in favor of choosing the Secretary's reading over that urged by [the provider] is the preservation of the Medicare Statute's 180-day limitation on reviewing an intermediary's determination of total program reimbursement" as set forth in § 1395oo(a)(3).  Id. at 620.  Hence, the court rejected the provider's argument that all matters covered by an NPR can be reopened whenever any single issue in the NPR is reopened by the intermediary.  Id.  Here, the "preservation of the Medicare Statute's 180-day limitation period" would be entirely undercut by plaintiffs' broad proposition that equitable tolling is authorized by § 1395oo(a)(3).  Indeed, the reopening regulations would be rendered virtually superfluous.

In Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999), the Supreme Court indicated that the plain language of the 180-day limitations period in § 1395oo(a)(3) demonstrated that judicial review of stale determinations was not allowed -- there, under the mantel of an attempt to obtain judicial review of a reopening decision.  The Court in Your Home considered whether the PRRB had jurisdiction to review a fiscal intermediary's refusal to reopen a reimbursement determination, and ultimately concluded that the Board -- and hence the district court -- did not have jurisdiction to review a refusal to reopen. Id. at 453-55.  In reaching this conclusion, the Court effectively upheld the reopening regulations in language strongly suggesting that the 180-day limitations period cannot be circumvented based on general fairness considerations:

> The right of a provider to seek reopening exists only by grace of the Secretary, and the statutory purpose of imposing a 180-day limit on the right to seek Board review of NPRs, see 42 U.S.C. § 1395oo(a)(3), would be frustrated by permitting requests to reopen to be reviewed indefinitely.
>
>      . . .

> Title 42 CFR § 405.1885 (1997) generously gives them [providers] a second chance to get the decision changed -- this time at the hands of the intermediary itself, but without the benefit of administrative review.  That is a "suitable" procedure, especially in light of the traditional rule of administrative law that an agency's refusal to reopen a closed case is generally "'committed to agency discretion by law'" and therefore exempt from judicial review. . . . As for the alleged "double standard," given the administrative realities we would not be shocked by a system in which underpayments could <u>never</u> be the basis for reopening. . . . [E]ach of the tens of thousands of sophisticated Medicare-provider recipients of these NPRs is generally capable of identifying an underpayment in its own NPR within the 180-day time period specified in 42 U.S.C. § 1395oo(a)(3).

525 U.S. at 454-56 (emphasis in original, citations omitted).  The Supreme Court's assessment of § 405.1885 strongly indicates that the 180-day limitations period is not subject to equitable tolling.  Based on the statutory language, the regulations granting only limited exceptions to the 180-day limitations period, and the Supreme Court's determination in <u>Your Home</u> that the 180-day limit may not be circumvented by expanding Board (and hence, district court) jurisdiction to review requests to reopen, the Court concludes that equitable tolling of the 180-day limitations period is not available under 42 U.S.C. § 1395oo.

<u>Brockamp</u> suggests that the Court may consider, albeit secondarily, whether "the nature of the underlying subject matter" supports the Court's assessment of the statutory language.  <u>See</u> 519 U.S. at 352 ("The nature of the underlying subject matter -- tax collection -- underscores the linguistic point.").  Hence, defendant submits an array of statistics to demonstrate that the complexity of the Medicare program and the administrative burden of allowing equitable tolling under § 1395oo(a) confirm the unreasonableness of construing the statute to authorize equitable

tolling.[12]  See Def.'s Mem. at 21-22.  The Court declines to rely specifically on that extra-

pleading information here because the viability of most of plaintiffs' claims is being challenged

on a motion to dismiss under Rule 12(b)(6), rather than on summary judgment.   However, the

Court notes the Supreme Court's observation in Your Home that "tens of thousands of

sophisticated Medicare-providers" are recipients of NPRs, and its corresponding assessment that,

hence, "administrative realities" may result in underpayments that are never reopened.  525 U.S.

at 456.  The volume and complexity of the provider reimbursement program at issue here is,

quite plainly, comparable to the tax refund program in Brockamp, as to which the Supreme Court

observed that the "magnitude of the administrative problem" cut against the availability of

equitable tolling.  To this extent, then, the complexity and nature of the Medicare Part A program

supports the Court's conclusion that Congress did not intend to authorize equitable tolling in

§ 1395oo(a).  In any event, plaintiffs have proffered nothing suggesting that the nature of the

Medicare program implies that Congress intended to authorize equitable tolling for provider

claims, notwithstanding the express language of § 1395oo(a) and the longstanding regulations

granting only limited relief from the 180-day limitations period.  Hence, although not central to

this Court's analysis, the Court's determination that equitable tolling is not authorized by

§1395oo(a) is buttressed by the scope and complexity of the Medicare program.

---

[12] For example, defendant asserts that "[t]he Medicare program involves nearly $212
billion in annual payments to over 38,000 providers" as well as other entities, that it processes
"more than a billion claims per year," and that 25 contractors process $202 billion in claims for
about 6,000 hospitals, 15,000 skilled nursing facilities, and other providers of institutional care
under Medicare Part A."  See Def.'s Mem. at 21-22 (citing http://www.cms.hhs.gov/
CapMarketUpdates/ Downloads/2007CMSstat.pdf).  Although plaintiffs do not dispute these
figures, they are technically beyond the scope of a Rule 12(b)(6) motion.

III.    **Mandamus**

Plaintiffs contend that, in the event they are precluded from obtaining relief under

§ 1395oo(f), they are entitled to a writ of mandamus requiring new DSH determinations under 28

U.S.C. § 1361 because defendant has a "non-discretionary duty to use correct SSI percentages"

when determining DSH payments.  See Pls.' Mem. at 20-22.  Plaintiffs further assert that

defendant has a nondiscretionary duty to reopen intermediary determinations "if it is established

that such determination . . . was procured by fraud or similar fault of any party to the

determination or decision" -- a point they consider established by the Baystate decisions issued

by the Board and this Court.  Pls.' Mem. at 12, 21 (quoting 42 C.F.R. § 405.1885(d)).  Defendant

counters that the Court lacks mandamus jurisdiction because plaintiffs fail to satisfy the

prerequisites for mandamus relief.  See Def.'s Mem. at 12-18; Def.'s Reply at 8-9.  The relevant

duty for the mandamus inquiry, in defendant's view, is whether the Secretary had a

nondiscretionary duty to extend the 180-day limitations period or to reopen the NPR.  Under the

regulations, both of those matters are plainly discretionary, which would preclude mandamus

relief. Defendant further contends that plaintiffs' failure to exhaust administrative remedies

precludes them from obtaining mandamus relief.

Mandamus is a drastic remedy to be invoked only in extraordinary situations and to be

granted only when essential to the interests of justice.  See Oglala Sioux Tribe of Pine Ridge

Indian Reservation v. U.S. Army Corps of Eng'rs, 570 F.3d 327, 333 (D.C. Cir. 2009).  Under 28

U.S.C. § 1361,[13] a court has jurisdiction to grant mandamus relief only if "(1) the plaintiff has a

---

[13]  The mandamus statute provides that "[t]he district courts shall have original
jurisdiction of any action in the nature of mandamus to compel an officer or employee of the
United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." In re Medicare Reimbursement Litig., 414 F.3d at 10 (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)); Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005). To maintain a mandamus action in the Medicare context, a plaintiff also must exhaust his administrative remedies unless exhaustion would be futile. Heckler v. Ringer, 466 U.S. 602, 616-18 (1984); Monmouth Med. Ctr., 257 F.3d at 813. "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." In re Cheney, 406 F.3d at 729. The party seeking mandamus has the "burden of showing that [his] right to issuance of the writ is clear and indisputable." Gulfstream Aerospace Corp v. Mayacamas Corp., 485 U.S. 271, 289 (1988) (internal quotation marks and citation omitted).

The parties focus primarily on whether defendant owes plaintiffs a nondiscretionary duty, but identification of the relevant duty has shifted as the litigation has developed. Plaintiffs' complaint alleges that the nondiscretionary duty owed to providers is a "non-discretionary duty to use correct SSI percentages" when determining DSH payments. Compl. ¶¶ 62, 64; see Pls.' Mem. at 20. In their merits brief and at the motions hearing, however, plaintiffs rely almost exclusively on defendant's duty to reopen and revise a determination whenever "fraud or similar fault of any party" is established. See Pl.'s Mem. at 21-22 (quoting 42 C.F.R. § 405.1885(d)).

Plaintiffs fail to establish a nondiscretionary duty to act in either formulation. With respect to the so-called "duty to use correct SSI percentages" in determining DSH payments, plaintiffs misconstrue the case law. This Court has previously held that the "best available data" standard, long-recognized in the case law as governing other Medicare reimbursement determinations, governs the validity of SSI percentages, not some abstract standard of "correctness" or perfection. See Baystate, 545 F. Supp. 2d at 49 ("The case law amply supports

27

the proposition that the best available data standard leaves room for error, so long as more

reliable data did not exist at the time of the agency decision.") (citing Methodist Hosp. of

Sacramento v. Shalala, 38 F.3d 1225, 1228-30 (D.C. Cir. 1994), and Mt. Diablo Hosp. v. Shalala,

3 F.3d 1226, 1233 (9th Cir. 1993)).

Even recasting plaintiff's "duty" argument as a duty to determine the SSI percentages

based on the "best available data," plaintiffs would not succeed.  The failure to use the "best

available data" -- or to use "correct" SSI percentages for that matter -- is, in essence, an allegation

that the intermediary's determination was "inconsistent with the applicable law."  The regulations

require reopening of an NPR in this circumstance only where "CMS . . . [p]rovides notice to the

intermediary that the intermediary determination . . . is inconsistent with the applicable law,

regulations, CMS rulings, or CMS general instructions in effect, and as CMS understood those

legal provisions at the time the determination or decision was rendered by the intermediary."  42

C.F.R. § 405.1885(b)(1)(i).  As defendant points out, "CMS has never explicitly (or implicitly)

notified plaintiffs' intermediaries that their determinations were inconsistent with applicable

law," and, indeed, defendant's position is that those determinations involve, at worst, a "flawed

data" problem, not any inconsistency with the law.[14]  See Def.'s Mem. at 14-15.  In the absence of

CMS issuing a notice to the intermediary stating that the determination is inconsistent with

---

[14]  Even if this Court's Baystate decision operated as a de facto notice of inconsistency
with applicable law, § 405.1885(b)(1)(i) would not impose a duty on CMS or the intermediaries
to reopen the NPRs at issue.  This is because, with respect to inconsistency with applicable law,
the regulation imposes a duty to reopen only if the notice of inconsistency occurs "within the
three-year period" after the date of the intermediary's determination (i.e., NPR issuance),
effectively excluding NPRs older than three years from the mandatory reopening.  See Baptist
Mem. Hosp. v. Johnson, 603 F. Supp. 2d 40, 43-44 (D.D.C. 2009).  Here, plaintiffs' NPRs were
issued far outside of that three-year window, with the most recent having been issued in or
around 1996.

applicable law, there is no mandatory duty to reopen a payment determination.

Plaintiffs' main contention, in any event, is that they are entitled to mandamus relief based on defendant's duty to reopen payment determinations procured by fraud.  See Pl.'s Mem. at 21-22 (discussing 42 C.F.R. § 405.1885(d)).  In their view, the Baystate decisions issued by the Board in 2006 and this Court in 2008 establish that the data flaws underlying their NPRs were "deliberately concealed" by CMS, which requires reopening under the fraud provision "at any time."  Id. at 22.  There are two problems with this argument.  First, nothing in either of the Baystate decisions reflects a finding that CMS "deliberately concealed" the data flaws at issue or otherwise engaged in fraud.  Rather, the Board simply found that "'that CMS knew or should have known at least by 1993 that there was a problem with the SSI data received from SSA,'" and thus rejected the contention that CMS had used the "best available data." Baystate, 545 F. Supp. 2d at 27 (quoting Baystate Board Decision at 34-35).   The Board made no finding regarding fraud or deliberate concealment.  This Court, reviewing the Board's decision, similarly concluded that CMS had not used the "best available data," but likewise made no finding regarding fraud or deliberate concealment.  Id.

Second, and equally significant, plaintiffs have failed to exhaust their administrative remedies.  As noted earlier, exhaustion of administrative remedies is a prerequisite to the extraordinary remedy of mandamus, unless exhaustion would be futile.  See Monmouth, 257 F.3d at 810 ("we must first examine all other possible avenues of relief to ensure that the hospitals have fully exhausted those which were available"); In re Medicare Reimbursement Litig., 414 F.3d at 11 (finding that futility was demonstrated where, inter alia, the reopening period had expired and CMS had issued a ruling "barr[ing] intermediaries from reopening closed NPRs to recalculate DSH entitlement").  Indeed, where providers seek mandamus based on the

reopening provisions, they must show that "they have done all they can to vindicate their right to reopening."  Monmouth, 257 F.3d at 815.

There is no allegation in the complaint that plaintiffs ever sought to reopen their NPRs based on fraud, and they admitted as much at the motions hearing.  Their only excuse is that they anticipate difficulties in obtaining information from the agency to support their claim of fraud. But by plaintiffs' own account, they believe evidence in the Board's Baystate administrative record supports their allegations of fraud, and that record was long-ago filed with this Court in the Baystate civil action.  See Baystate Med. Ctr. v. Leavitt, Civil Action No. 06-1263, Notice of Filing of Administrative Record (D.D.C. filed Nov. 22, 2006).  Moreover, plaintiffs have other means for obtaining information in support of their claim, such as the Freedom of Information Act.  Plaintiffs suggested at the motions hearing that, even if they obtain evidence demonstrating fraud, a request for reopening is likely to be unsuccessful, and defendant's litigation counsel suggested the same.[15]  But as was observed recently in Bradley Mem. Hosp. v. Leavitt, 599 F. Supp. 2d 6, 17 (D.D.C. 2009), "[t]he point of pursuing administrative relief is to exhaust avenues by which [p]laintiffs might have convinced the agency to change its position without resorting to the type of extraordinary relief that [p]laintiffs now request."  In short, there is no basis here for excusing plaintiffs from the requirement to exhaust administrative remedies as a prerequisite to mandamus relief.

---

[15]  At the motions hearing, a Department of Justice attorney suggested for the first time during rebuttal argument that the fraud reopening provision is not applicable if the person allegedly acting fraudulently is the Secretary because the Secretary is not a "party" to the intermediary's determination within the meaning of the regulation.  This contradicts defendant's earlier statement in its brief that plaintiffs should be required to exhaust their administrative remedies with respect to the allegation of fraud under § 405.1885(d).  See Def.'s Reply at 9 n.5. Because the attorney presenting rebuttal offered only a post hoc interpretation of the regulation that is inconsistent with the brief approved by the agency, the Court gives the statement no weight.

Should plaintiffs exhaust their administrative remedies, and then return to court with evidence that establishes fraud or concealment with respect to the calculation of the SSI percentages, a court may consider their request for mandamus relief anew.  But at this time, plaintiffs have fallen far short of alleging facts that would establish their entitlement to the extraordinary remedy of mandamus.[16]

## IV.      Availability of Relief under 28 U.S.C. § 1331

As a last resort, plaintiffs invoke the federal question statute, 28 U.S.C. § 1331, as a basis for bringing their claims for relief.  Plaintiffs contend that if judicial review of their challenges is not available under § 1395oo(f) or the mandamus statute, they are entitled to bring their claims for relief directly under § 1331.  Defendant responds that Congress has disallowed judicial review of Medicare claims under § 1331, as set forth in 42 U.S.C. § 405(h) and § 1395ii, instead choosing to channel judicial review under § 1395oo.  The Court agrees.

As the D.C. Circuit explained in Monmouth, § 1395oo sets forth "detailed instructions on the means for seeking review of payment determinations," and in tandem with that provision, "[§] 1395ii generally forecloses other avenues of review by incorporating the review-limiting provisions of the Social Security Act, 42 U.S.C. § 405(h)."  257 F.3d at 809.  Section 405(h), with the substitutions required by § 1395ii, provides that:

---

[16]  In Count Three of the complaint, plaintiffs seek substantially the same mandamus relief under the All Writs Act, 28 U.S.C. § 1651(a).  See Compl. ¶¶ 63-64.  It is well-settled, however, that "the Act itself is not a grant of jurisdiction."  In re Tennant, 359 F.3d 523, 527 (D.C. Cir. 2004).  The All Writs Act provides that the federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a) (emphasis added).  This statutory language makes clear that the authority to issue writs is confined to the issuance of process "in aid of" jurisdiction that is created by some other source and not otherwise enlarged by the Act.  In re Tennant, 359 F.3d at 527.  Because the All Writs Act does not provide a separate basis for relief, Count Three will be dismissed.

> The findings and decision of [the Secretary of HHS] after a hearing shall be binding upon all individuals who were parties to such hearing.  No findings of fact or decision of [the Secretary of HHS] shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the [Secretary of HHS], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

Monmouth, 257 F.3d at 809 (quoting 42 U.S.C. § 405(h), alterations in original).[17]  Hence,

§ 1331 "review [of Medicare payment determinations] could not be more plainly off limits under

42 U.S.C. § 405(h), which explicitly withholds § 1331 jurisdiction for 'any claim arising under

this title.'"  Id. at 812.  A provider's claim "arise[s] under" the Medicare Act within the meaning of

§ 405(h) when "'both the standing and the substantive basis for the presentation of the claim are

the Medicare Act.'"  Your Home, 525 U.S. at 456 (quoting Ringer, 466 U.S. at 615).  Here,

plaintiffs' claims clearly arise under the Medicare Act – and hence are covered by § 405(h) –

because they arise from the calculation of payments under the Medicare DSH provision and have

as their ultimate goal the recovery of additional sums under the Medicare Act.  See Monmouth,

257 F.3d at 812.

To be sure, the Supreme Court has recognized a narrow exception to § 405(h) where its

application "would not simply channel review through the agency, but would mean no review at

all."  See Shalala v. Illinois Council on Long Term Care, 529 U.S. 1, 19 (2000).  Plaintiffs

contend that they fall within this exception because, without judicial review of their DSH

payments under § 1331, the Secretary's actions would be immunized from judicial scrutiny.  See

---

[17]  Section 1395ii provides that "[t]he provisions . . . of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter, except that, in applying such provisions with respect to this subchapter [Medicare], any reference therein to the Commissioner of the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively."

Pls.' Mem. at 22.  The flaw in plaintiffs' position, however, is that judicial review of plaintiffs' DSH payments was, in fact, available under § 1395oo(f), but plaintiffs missed their opportunity to obtain judicial review by failing to seek Board review within 180 days of receiving the intermediary's final determination.  Hence, it is only by virtue of plaintiffs' untimeliness that judicial review on their current claims may be foreclosed.  The Secretary's actions in implementing the DSH program have <u>not</u> generally been immunized from judicial review, then, as demonstrated by cases before this Court in which providers did, in fact, file timely administrative appeals raising the same issues as plaintiffs, as well as cases under § 1395oo.  <u>See</u>, <u>e.g.</u>, <u>Baystate</u>, 545 F. Supp. 2d 20; <u>Northeast Hosp. Corp. v. Sebelius</u>, Civil Action No. 09-0180 (D.D.C. filed Jan. 30, 2009).[18]  Moreover, to the extent that plaintiffs can identify a nondiscretionary duty owed to them under the Medicare Act, they may obtain judicial review and relief under the mandamus statute – an avenue left open by this Court's resolution of the mandamus claim.  As with any claim for relief, the failure of plaintiff to seek judicial review in a timely manner, or to prevail on a claim, does not mean that there is, under <u>Illinois Council</u>, "no review at all."  Accordingly, pursuant to § 1395ii and § 405(h), the Court concludes that it lacks jurisdiction to review plaintiffs' claims for relief directly under § 1331.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to dismiss.  Plaintiffs' claims for relief under 42 U.S.C. § 1395oo and in the nature of mandamus will be dismissed for failure to state a claim upon which relief can be granted.  Plaintiffs' claims for relief directly

---

[18]  In <u>Northeast Hosp.</u>, the Secretary has conceded that a provider who filed a timely appeal contesting its DSH payment based on the defects described in <u>Baystate</u> (and raised by plaintiffs in this case) was entitled to a remand for recalculation of its DSH payment.  <u>See</u> <u>Northeast Hosp.</u>, Def.'s Mem. in Supp. of Mot. for Summ. J. at 5-6 (filed Oct. 2, 2009).

under 28 U.S.C. § 1331 will be dismissed for lack of subject matter jurisdiction.  A separate

order has been issued on this date.


                                        /s/
                          _____
                              JOHN D. BATES
                          United States District Judge

Dated:  February 26, 2010